UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KIMBERLY GRIPPA,                              CASE NO. 4:20cv457-MW/MAF
    *Plaintiff,*

vs.

RONALD RUBIN,
    *Defendant.*
_____/

## **MOTION TO DISMISS AMENDED COMPLAINT**

Ronald Rubin respectfully requests entry of an order dismissing Kimberly Grippa's Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a facially plausible claim for defamation. As shown below, dismissal is warranted because Grippa's claim is based on: (1) allegations in Rubin's state-court lawsuit, which are absolutely privileged; (2) letters to Florida's Governor and Chief Inspector General that were not about Grippa and, further, were qualifiedly privileged; and (3) statements of opinion not readily capable of being proven false.

This action is part of a larger effort by Grippa, her ex-husband, and several Florida officials to harass and burden Rubin with costly, time-consuming and baseless litigation and retaliatory threats of criminal prosecution to discourage him from pursuing his well-documented claims of public corruption. This lawsuit contravenes Florida's anti-SLAPP statute, and Rubin should be awarded his fees and costs for having to defend it.

## RELEVANT FACTS

On February 26, 2019, the Florida Cabinet voted to appoint Rubin as Commissioner of the Florida Office of Financial Regulation ("OFR") after Florida's Chief Financial Officer Jimmy Patronis had nominated him for the position.[1] In early March 2019, Florida Department of Financial Services ("DFS") Chief of Staff Ryan West gave Rubin Grippa's résumé and said he hoped Rubin would interview her for OFR General Counsel.[2] Lobbyist Paul Mitchell then told Rubin that the résumé had come from Patronis and that Grippa was the ex-wife of Patronis' friend who wanted Grippa to get a job in Tallahassee where he was planning to relocate so they could be in the same city with their minor child.[3]

---

[1] *See* Ronald Rubin's Statement Regarding May 2019 Investigation (**Ex. A**) p. 2. Although Grippa's claim is based in part on remarks contained in Rubin's written statement, she did not attach it to her complaint. Under the "incorporation by reference" doctrine, a document attached to a motion to dismiss may be considered by the court without converting it into a summary judgment motion if the attached document is (1) central to the plaintiff's claim and (2) the document's authenticity is not challenged. *See, e.g.*, *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (applying doctrine in context of Rule 12(c) motion for judgment on the pleadings and finding article that contained allegedly defamatory statements should be considered because article was central to plaintiff's defamation claim and its authenticity was undisputed). Indeed, "[t]o determine if a statement is defamatory, it must be considered in the context of the publication." *Parekh v. CBS Corp.*, No. 19-11794, 2020 WL 3400679, at *3 (11th Cir. June 19, 2020) (internal quotation marks omitted).

[2] Ex. A p. 2.

[3] *Id.*

2

On March 21, 2019, Rubin interviewed Grippa and concluded that she was not qualified for the position and that he did not want to hire her.[4] That evening, Mitchell called Rubin and screamed, "I spoke with Kim [Grippa]. What the hell is wrong with you? She said you called her incompetent!"[5] Rubin responded that he had not said Grippa was incompetent but rather that she was not qualified to be OFR's enforcement director, to which Mitchell replied, "Her qualifications are irrelevant. You were just supposed to hire her!"[6]

The following day, Mitchell told Rubin to interview Abigail Vail for the position of OFR Deputy Commissioner (to be renamed Chief of Staff) with no one else present.[7] Although he was uncomfortable with the situation, Rubin did as Mitchell had instructed.[8] Following the interview, Mitchell texted Rubin that Vail had told him that

---

[4] Am. Compl. [ECF No. 1-2, pp. 18-33] ¶ 7; *see also* 2d Am. Compl., *Rubin v. Mitchell*, Fla. Cir. Ct. Case No. 2019-CA-2535 (**Ex. B**) ¶ 17. By alleging that it contains defamatory statements, Grippa also incorporates by reference Rubin's Second Amended Complaint filed against Mitchell in state court. *See supra* note 1. The Court also "may take judicial notice of publicly filed documents such as those in state court litigation, at the Rule 12(b)(6) stage." *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015).

[5] Ex. A p. 4.

[6] *Id.*

[7] Ex. B ¶ 20.

[8] *Id.*

3

the interview "went great!"[9] Rubin hired Vail and she began working at OFR on April 22, 2019.[10]

On April 29, 2019, Rubin took an employee ("EE") to lunch, and the two stopped by his unfinished apartment on the way to and from lunch so he could check whether the baseboards had been painted.[11] Over lunch, Rubin talked about his family and asked EE about hers.[12] The following day, West and Vail told Rubin that EE had said she felt awkward working for Rubin, based on the lunch.[13] Shortly thereafter, Vail reassigned EE to work directly for her and moved EE to a different floor.[14] Throughout the following week, the OFR Resource Management Administrator repeatedly told Rubin that EE was fine and doing well in her new role.[15]

On May 2, 2019, Mitchell told Rubin that EE and Vail had complained about Rubin and that EE would file a sexual harassment complaint against him if he did not immediately resign.[16] Mitchell then emailed to Rubin a resignation letter that he had

---

[9] *Id.* ¶ 21.

[10] *Id.* ¶ 23.

[11] *Id.* ¶ 24; Ex. A pp. 6-7.

[12] *Id.* p. 7; Ex. B ¶ 24.

[13] *Id.* ¶ 25.

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶ 26.

prepared and told Rubin to sign it.[17] Knowing he had not sexually harassed anyone, Rubin refused to sign the letter and refused to resign.[18]

On the morning of Friday, May 10, 2019, Vail told Rubin that, if he did not immediately resign, EE would file a sexual harassment complaint against him and that Patronis would publish the complaint.[19] Rubin again refused to resign.[20] That afternoon, Vail convinced EE to submit a written complaint about the "awkward" lunch.[21] That same day, DFS General Counsel Peter Penrod reversed Rubin's earlier refusal to hire Grippa and offered her a deputy counsel position reporting directly to Penrod (who reports directly to Patronis).[22] That evening, Patronis issued a press release and published EE's complaint on the internet, calling it a "sexual harassment" complaint even though it did not allege conduct constituting sexual harassment under DFS policy or the law.[23]

On Monday, May 13, 2019, Grippa sent an email to West alleging that Rubin had made discriminatory statements and committed "inappropriate acts" during her March

---

[17] *Id.*

[18] *Id.*

[19] *Id.* ¶ 32.

[20] *Id.*

[21] *Id.* ¶ 33.

[22] *Id.* ¶ 35.

[23] *Id.* ¶ 36.

21 interview.[24] Patronis quickly published Grippa's complaint and it became part of DFS' investigation.[25]

In late May 2019, Rubin submitted a written statement to state investigators, responding to the published allegations against him, which included Grippa's May 13 email.[26] Approximately 4 pages of the 11-page written statement related to his interview of Grippa.[27] After describing the circumstances that led to the interview, Rubin stated that the interview "did not go well from [his] perspective."[28] He then detailed Grippa's behavior that formed the basis for that conclusion, including that:

- She told him she had done no research on him, had read none of his articles, and knew very little about him.[29]

- She placed a printout of OFR's organizational chart on the table and said she had reviewed it and would like to be deputy commissioner (to which he replied that he was reorganizing the agency and converting the deputy commissioner position to chief of staff).[30]

- When he told her he considered the head of the enforcement division to be the second-most important job (after the commissioner's) in the new organizational structure, she immediately said, "Okay, I'll take that job."[31] He responded that, based on her résumé, "enforcement director was the one job she could not be expected to perform" because "the person in that role would

---

[24] *Id.* ¶ 46(a); Am. Compl. ¶¶ 8-9.

[25] *Id.* ¶ 11; Ex. B ¶¶ 45-46.

[26] Ex A; Ex. B ¶ 51; Am. Compl. ¶16.

[27] Ex. A pp. 1-5.

[28] *Id.* p. 2.

[29] *Id.*

[30] *Id.* p. 3.

[31] *Id.* p. 4.

6

have to be an experienced litigator with some combination of expertise in securities law, consumer finance law, criminal law and banking law."[32] She replied that she had worked in environmental administrative law from 1997 to 2001.[33]

In his statement, Rubin also recounted the portion of his conversation with Mitchell about Grippa's interview described above.[34] He further stated that, in that conversation, he told Mitchell that he had hoped to hire Grippa but she "was so unpleasant, and had such an air of entitlement, that [he] feared she would make [his] staff and other OFR employees miserable."[35] He also reported that, when West had mentioned Grippa's interview during a conversation on April 30, he told West that she "had not even pretended [their] lunch was a real interview, and that she was angry because [he] had treated it as a real interview."[36]

In June 2019, Rubin filed a state-court lawsuit against Mitchell in which he alleged that Patronis, West, Mitchell, Penrod, Vail, Grippa and others are members of an "enterprise" that uses a "pay to play" system of blackmail and intimidation to extract illegal campaign contributions, install loyalist patrons, and eliminate "outsiders" who might expose their unlawful activities.[37] On June 21, 2019, Rubin's counsel sent letters

---

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] *Id.* p. 5.

[36] *Id.* p. 8.

[37] Ex. A.

7

to Governor Ron DeSantis and Chief Inspector General Melinda Miguel, the latter of which included a hyperlink to Rubin's state-court complaint, requesting that the Chief Inspector General's Office open an investigation into the misuse of public office by Patronis and his inner circle.[38]

## GRIPPA'S ALLEGATIONS

To support her defamation claim, Grippa alleges:

1) Rubin "filed several lawsuits (including Case No. 2019 CA 002535) wherein GRIPPA is listed as a co-conspirator of the 'enterprise' that Rubin claims blackmailed, intimidated and extorted him and that she was associated with 'racketeering, political corruption, abuse of power, and misuse of taxpayer money at the highest levels of DFS.'"[39]  Grippa asserts that Rubin's accusations are false.[40]

2) Rubin's June 21, 2019 letters to Gov. DeSantis and Chief IG Miguel "detailed improper, unethical and seemingly unlawful conduct on the part of" Grippa, which letters "publicly and falsely disparaged" her.[41]

3) In his written statement, which Grippa alleges was incorporated into an article published on "FLAPOL, a publication through floridapolitics.com," Rubin falsely stated that Grippa:

   a. "was not 'qualified to be the agency's enforcement director'";

   b. "'had an air of entitlement and that [he] feared she would make [his] staff and other OFR employees miserable'"; and

---

[38] *Id.* ¶ 15; *see also* 6/21/19 Letters (**Composite Ex. C**).  Grippa incorporated the letters into her complaint by alleging that they contain defamatory statements.  *See supra* note 1.

[39] Am. Compl. ¶ 13.  In truth, the *Mitchell* case is the only lawsuit Rubin filed that names Grippa as a member of the "enterprise."

[40] *Id.* ¶ 14.

[41] *Id.* ¶ 15.

8

      c.      "had 'not even pretended [their] lunch was a real interview and … she was angry because [he] had treated it as a real interview.'"[42]

## LEGAL STANDARD

The Rule 8 pleading standard "demands more than an unadorned, the-defendant-unlawfully harmed me accusation."[43] A complaint must set forth *factual content* from which the Court may draw a reasonable inference that the defendant is liable for the misconduct alleged.[44]

In considering a motion to dismiss, the Court must accept the factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff.[45] But the Court should disregard bald assertions, subjective characterizations, and legal conclusions.[46]

---

[42] *Id.* ¶ 16.

[43] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *see also* FED. R. CIV. P. 8(a)(2) (requiring "a short and plain statement of the claim"). Although Plaintiff filed her Amended Complaint in state court, the Federal Rules of Civil Procedure "apply to a civil action after it is removed from a state court." FED. R. CIV. P. 81(c)(1); *see also McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) (pursuant to *Erie*, federal law governs post-removal procedural issues involving state-law claims). "The scope of the Court's review on a motion to dismiss is a procedural issue, and thus, governed by federal law." *Eiras v. Fla. Dep't of Bus. & Prof'l Reg.*, 239 F. Supp. 3d 1331, 1340 n.12 (M.D. Fla. 2017).

[44] *Iqbal*, 556 U.S. at 678; *see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

[45] *See, e.g.*, *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994).

[46] *Iqbal*, 556 U.S. at 678-79 (reversing denial of 12(b)(6) motion to dismiss upon finding that, after conclusory allegations were disregarded, the remaining allegations failed to plausibly state a claim).

## **DISCUSSION**

**1.     Rubin's allegations in the *Mitchell* lawsuit are absolutely privileged.**

In alleging that Rubin's pleadings in the *Mitchell* lawsuit are defamatory,[47] Grippa ignores longstanding precedent establishing that statements made in the course of judicial proceedings are absolutely privileged if they are "connected with, or relevant or material to, the cause in hand or subject of inquiry,"[48] regardless of "how false or malicious the statements may be."[49]

Although courts have described the litigation privilege as an affirmative defense, "Florida courts have also made it abundantly clear that any affirmative defense, including the litigation privilege, may be considered in resolving a motion to dismiss when the complaint affirmatively and clearly shows the conclusive applicability of the defense to bar the action."[50]

The litigation privilege bars defamation claims if "the defamatory statements at issue were made either in front of a judicial officer or *in pleadings or documents filed*

---

[47] Grippa also fails to identify any false statements of *fact* in Rubin's pleadings. "The first element of the claim, a false statement of *fact*, is the *sine qua non* for recovery in a defamation action." *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006) (emphasis added) (alterations and internal quotation marks omitted).

[48] *Myers v. Hodges*, 44 So. 357, 361 (Fla. 1907); *see also Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380, 383 (Fla. 2007) (noting that *Myers* "recognized the principle of the litigation privilege in Florida, essentially providing legal immunity for actions that occur in judicial proceedings").

[49] *Fridovich v. Fridovich*, 598 So. 2d 65, 66 (Fla.1992).

[50] *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1277 (11th Cir. 2004).

*with the court* or quasi-judicial body."[51]  The litigation privilege thus bars Grippa's claim to the extent it is based on Rubin's pleadings in the *Mitchell* case.[52]

## 2. Grippa cannot maintain a claim based on Rubin's letters to the Governor and Chief Inspector General.

### a. The letters were not about Grippa.

To state a claim for defamation under Florida law, a plaintiff must allege that: "(1) the defendant published a false statement; (2) *about the plaintiff*; (3) to a third party; and (4) that the falsity of the statement caused injury to the plaintiff."[53]  Grippa cannot maintain a defamation claim based on the letters to Gov. DeSantis and Chief IG Miguel because no statements in the letters were *about her*.  In the letters, Rubin requested that the Chief IG open an investigation into "misuse of public office by CFO

---

[51] *DelMonico v. Traynor*, 116 So. 3d 1205, 1217 (Fla. 2013) (emphasis added).

[52] *See, e.g., Huls v. Llabona*, 437 F. App'x 830, 833 (11th Cir. 2011) (per curiam) (affirming dismissal on litigation-privilege grounds of claims alleging attorney misrepresented the language of a court order in a subsequent motion for contempt); *see also EMI Sun Vill., Inc. v. Catledge*, 779 F. App'x 627, 635-36 (11th Cir. 2019) (per curiam) (affirming dismissal on litigation-privilege grounds of abuse-of-process claim alleging defendants improperly initiated litigation against plaintiff); *Madura v. Bank of Am., N.A.*, 767 F. App'x 868, 873 (11th Cir. 2019) (per curiam) (affirming dismissal of claim alleging law firm and attorneys engaged in fraudulent conduct during a judicial proceeding, based in part on litigation privilege).

[53] *Matonis v. Care Holdings Grp., LLC*, 423 F. Supp. 3d 1304, 1315 (S.D. Fla. 2019) (emphasis added) (internal quotation marks omitted).

11

Patronis and his inner circle."[54] Neither letter mentioned Grippa.[55] As such, she cannot maintain a defamation claim based on the letters.[56]

### b.  The letters were qualifiedly privileged and Grippa does not allege facts to overcome the privilege.

Grippa's claim based on the letters also fails because the letters were qualifiedly privileged. Whether qualified immunity applies is a question of law.[57] Under Florida law, defamatory statements made to investigative authorities "prior to the institution of criminal charges are presumptively qualifiedly privileged."[58] Rubin's letters requested an investigation of Patronis for misuse of public office by the Chief Inspector General, as authorized by statute.[59] As such Rubin's letters were qualifiedly privileged.[60]

---

[54] Ex. C.

[55] *See id.*

[56] *See Parekh*, 2020 WL 3400679 at *4 (affirming dismissal of defamation claim based on statement in news report about whether plaintiff's former girlfriend falsified existence of a doctor who reportedly treated her for cancer, because statement was not about plaintiff).

[57] *Regions Bank v. Kaplan*, No. 8:12-CV-1837, 2013 WL 1193831, at *19 (M.D. Fla. Mar. 22, 2013).

[58] *Fridovich*, 598 So. 2d at 69.

[59] Florida Statutes § 14.32(2) mandates that the Chief Inspector General "(a) [i]nitiate, supervise, and coordinate investigations … to deter, detect, prevent, and eradicate … abuse, mismanagement, and misconduct in government [and] (k) [c]onduct special investigations … at the request of the Governor."

[60] *See Kaplan*, 2013 WL 1193831 at *20 (finding reports to Secret Service that counterclaim/crossclaim plaintiffs were kiting checks were qualifiedly privileged because Secret Service investigates financial fraud).

12

To overcome a qualified privilege, a plaintiff must plead express malice.[61] Florida courts have defined express malice as "ill will, hostility *and* an evil intention to defame and injure," and have stated that "the gravamen of express malice is the abuse of a privileged occasion by improper motives on the part of the speaker."[62] Although Grippa alleges that Rubin's statements "were malicious and intended to harm" her, these conclusory allegations do not meet the *Iqbal/Twombly* standard.[63] Accordingly, Grippa's claim based on Rubin's letters fails as a matter of law.[64]

### 3. Rubin's subjective assessment of Grippa's conduct and qualifications were non-actionable statements of opinion.

The First Amendment protects from defamation actions "[t]rue statements, statements that are not readily capable of being proven false, and statements of pure opinion."[65] Under Florida law, a publication constitutes "pure opinion" when "the defendant makes a comment or opinion based on facts which are set forth in the

---

[61] *See, e.g.*, *Jarzynka v. St. Thomas Univ. Sch. of Law*, 310 F. Supp. 2d 1256, 1268 (S.D. Fla. 2004).

[62] *Id.* (internal quotation marks omitted).

[63] *See Baker v. Joseph*, 938 F. Supp. 2d 1265, 1269 (S.D. Fla. 2013) ("'[T]he operative complaint asserts only that 'Defendants statements were made with actual malice.' This statement is a legal conclusion and, as such, does not satisfy the well-pleaded allegation requirement as set forth in *Bell Atlantic Corp. v. Twombly* ….").

[64] *See Jarzynka*, 310 F. Supp. 2d at 1268 (dismissing with prejudice defamation claims because complaint showed that defendant's remarks were privileged, and plaintiff failed to overcome privilege by alleging facts showing that defendant acted with malice).

[65] *See, e.g.*, *Turner v. Wells,* 879 F.3d 1254, 1262 (11th Cir. 2018).

publication."[66]  Whether a statement is pure opinion is a question of law.[67]  In determining whether an expression is fact or opinion, "the court must examine the statement in its totality and the context in which it was uttered or published" and "must consider all of the words used, not merely a particular phrase or sentence."[68]  The court also "must give weight to cautionary terms used by the person publishing the statement and consider all of the circumstances surrounding the statement."[69]

Applying these standards, Rubin's allegedly defamatory remarks in his written statement are pure opinion.  It is apparent from the nature of the remarks that Rubin was merely expressing his opinions.[70]  Further, he described in his statement Grippa's actions on which he based his opinions that she had not treated the interview as a real interview and had an "air of entitlement," including that she put the OFR organizational chart on the table and stated that she would like to be deputy commissioner and then, after he told her he was reorganizing the agency to convert that position to chief of staff, declared that she would take the to-be-created, second-most important job at

---

[66] *Id.*

[67] *Id.* at 1262-63.

[68] *Del Fuoco v. O'Neill*, No. 8:09-CV-1262, 2011 WL 601645, at*7 (M.D. Fla. Feb. 11, 2011) (quoting *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 460 (Fla. 5th DCA 1999)).

[69] *Id.*

[70] *See generally Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976) (finding statements that tenure in office of superintendent of schools was unsuccessful and that superintendent was unfit to hold office because of ineptness, incompetence and indecisiveness "were clearly matters of opinion, not statements of fact").

14

OFR (enforcement director).  Rubin also explained in his statement why he believed she was not qualified for that job: her résumé did not reflect that she had the experience he was seeking for that role—which he also detailed—and she did not otherwise indicate that she did.  Thus, the challenged remarks were "pure opinion" because the statement included the facts underlying those opinions.[71]

Furthermore, Rubin provided his written statement in response to the published accusations against him, including accusations made by Grippa.  In his statement, he described some of the facts and events that supported his belief that the investigation was "the product of efforts by Mr. Mitchell and Mr. Grippa [Plaintiff's ex-husband] to take political advantage of a concern informally voiced by [EE], in an attempt to force [him] to resign as commissioner, which [he was] unwilling to do."[72]  These facts and events included West's asking Rubin to interview Grippa, Mitchell's telling Rubin that Patronis supplied Grippa's résumé because Patronis' friend (Grippa's ex-husband) wanted her to get a job in Tallahassee, Grippa's unusual interview behavior, and Mitchell's angry reaction to learning that Rubin had considered Grippa's qualifications

---

[71] *See Del Fuoco*, 2011 WL 601645 at *7 (finding defendant's comment that plaintiff was "fixated on" him and that, because of that, others had suggested that he arm himself, was "pure opinion" because "the facts on which those opinions were based were disclosed in the statement itself"); *Borislow v. Canaccord Genuity Grp. Inc.*, Case No. 14-80134-CIV, 2014 WL 12580259 at *3 (S.D. Fla. June 27, 2014) ("Because the Report's prediction that Borislow's departure from magicJack should enable new management to achieve a stock price increase is an opinion supported by facts disclosed in the Report, it cannot be the basis of a defamation claim.").

[72] Ex. A p. 2.

15

rather than simply hiring her outright. Thus, the context of Rubin's allegedly defamatory statements further demonstrates they were non-actionable expressions of pure opinion.[73]

Indeed, Rubin's statements are not readily capable of being proven false.[74] Whether Grippa displayed an "air of entitlement" and whether she treated the interview like a real interview were Rubin's subjective assessments of her conduct, which cannot form the basis for a defamation claim.[75] Likewise, whether Grippa possessed the qualifications that Rubin envisioned for the yet-to-be-created position of enforcement director, is incapable of being proven false because only Rubin knew what qualifications he considered necessary for the position. Accordingly, Grippa's claim based on Rubin's written statement also necessarily fails.

---

[73] *See Del Fuoco*, 2011 WL 601645 at *7, *8 (finding context of allegedly defamatory statements responding to request for defendant to address "Management Experience" in his application for U.S. Attorney position showed statements were "nothing more than an opinionated description of Plaintiff's performance as an Assistant United States Attorney from [Defendant's] perspective as Plaintiff's Supervisor").

[74] *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 697 (11th Cir. 2016) (explaining difference between statements of opinion and statements of fact, noting that statements of fact are "readily capable of being proven true or false").

[75] *See, e.g.*, *Turner*, 879 F.3d at 1264 (finding statement that on at least one occasion plaintiff participated in "homophobic taunting" of a football player "is the Defendant's subjective assessment of [Plaintiff's] conduct and is not readily capable of being proven true or false"); *Santilli v. Van Erp*, Case No. 8:17-cv-1797, 2018 WL 2172554, at *6 (M.D. Fla. Apr. 20, 2018) ("Labeling [plaintiff] a 'mad professor,' and a 'fringe scientist,' are subjective assessments of [plaintiff's] work and not readily capable of being proven true or false.").

**4.    Rubin is entitled to fees and costs pursuant to Florida's anti-SLAPP law.**

It is "the declared policy of the State of Florida, as enunciated by the Legislature, … to spare individuals … the burden and expense of defending meritless defamation claims, particularly as concerns issues of public interest."[76] To that end, the Florida anti-SLAPP statute prohibits bringing a lawsuit (a) that is without merit and (b) because the defendant has exercised "the constitutional right of free speech in connection with a public issue,"[77] which is defined as any written or oral statement "made in or in connection with an issue under consideration or review by a governmental entity or ... made in or in connection with a ... news report, or other similar work."[78] Federal courts in Florida have applied anti-SLAPP statutes.[79] Florida's anti-SLAPP law provides that "[t]he court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section."[80]

---

[76] *Davis v. McKenzie*, Case No. 16-62499-CIV, 2017 WL 8809359, at *16 (S.D. Fla. Nov. 3, 2017).

[77] FLA. STAT. § 768.295(3)

[78] *Id.* § 768.295(2)(a).

[79] *See Tobinick v. Novella*, 108 F. Supp. 3d 1299, 1305 & n.4 (S.D. Fla. 2015) (noting that "the majority of circuit courts have found anti-SLAPP motions to strike permissible" and finding California's anti-SLAPP statute "protects substantive rights and thus applies in federal court"), *aff'd*, 848 F. 3d 935 (11th Cir. 2017); *see also Davis,* 2017 WL 8809359 at *17-20 (granting summary judgment for defendant pursuant to Florida's anti-SLAPP statute).

[80] FLA. STAT. § 768.295(4).

This case meets both requirements of Florida's anti-SLAPP law. First, as detailed above, Grippa's lawsuit is "without merit."[81] Specifically, her allegations do not support a defamation claim as a matter of law because the challenged statements are privileged, are not about her and/or are not defamatory. Second, this lawsuit arises out of Rubin's exercise of his "constitutional right of free speech in connection with a public issue,"[82] because the challenged publications constitute "written or oral statement[s] that [are] protected under applicable law" and were "made in or in connection with an issue under consideration or review by a governmental entity or … made in or in connection with a … news report, or other similar work."[83]  Under the anti-SLAPP law, an award of reasonable attorney's fees and costs is mandatory in these circumstances.[84]

## CONCLUSION

Grippa's Amended Complaint does not state a facially plausible claim for defamation. Accordingly, Rubin respectfully requests entry of an order dismissing this action in its entirety and awarding Rubin his attorney's fees and costs pursuant to Florida Statutes § 768.295.

---

[81] *Id.* § 768.295(3).

[82] *Id.*

[83] *Id.* § 768.295(2)(a).

[84] *Id.* § 768.295(4); *see also Parekh*, 2020 WL 3400679 at *6 (affirming award of fees under anti-SLAPP statute in action alleging defamation under Florida law arising from news report allegedly implying that plaintiff was in on scheme perpetuated by former girlfriend, pursuant to which she allegedly pretended to have cancer and solicited funds to support purported medical treatment).

18

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I certify that this memorandum complies with Local Rule 7.1(F). According to the word count of the Microsoft word-processing program, this memorandum contains a total of 4,644 words.

Respectfully submitted,

**TEIN MALONE PLLC**
*Counsel for Defendant Ronald Rubin*

*/s/ Gaye L. Huxoll*
Michael R. Tein
Florida Bar No. 993522
tein@teinmalone.com
Gaye L. Huxoll
Florida Bar No. 149497
ghuxoll@teinmalone.com
(305) 442-1101