**Ronald Rubin's Statement Regarding May 2019 Investigation**

At the outset, I stress that I have never and would never contemplate or engage in any kind of romantic or sexual relationship with an Office of Financial Regulation (OFR) employee. The OFR commissioner directly or indirectly supervises every OFR employee, so even a consensual romantic/sexual relationship between the OFR commissioner and an OFR employee would be improper and unacceptable.

A fair and complete evaluation of the matters described in XXXX's sexual harassment complaint requires consideration of important facts that predate XXXX's _____. Two individuals play a prominent role in this recounting and explain the expansion of this issue far beyond its original scope:

1. Paul Mitchell is a prominent Tallahassee lobbyist with Southern Strategy Group. One of his clients, a neighbor of my parents, introduced me to Mr. Mitchell in July of 2018 after my father asked the neighbor for advice on the appointment process. Mr. Mitchell said he was close with CFO Jimmy Patronis and his chief of staff, Ryan West. Over the next eight months, Mr. Mitchell and I communicated regularly and became friends, and as a friend (rather than a hired lobbyist), he advised me on the appointment process. He often told me he was doing so because our conversations had convinced him I was the most qualified person for the job, and Florida would benefit from my being commissioner. Mr. Mitchell informed me that he frequently spoke and met with CFO Patronis and Mr. West during the months leading up to my appointment as OFR commissioner on February 26, 2019.

2. Tony Grippa was Leon County District 4 commissioner until 2006, when he resigned to become a senior official at an insurance company based in the Daytona Beach area. In 2016, the company apparently fired him and he became a New York-based consultant.

As explained below, I believe that this investigation is the product of efforts by Mr. Mitchell and Mr. Grippa to take political advantage of a concern informally voiced by XXXX, in an attempt to force me to resign as commissioner, which I have been unwilling to do.

**Kimberly Grippa Complaint ("Complaint 2" - May 13, 2019 Email to Ryan West)**

On February 20, 2019, Mr. West called to inform me that the Florida Cabinet aides' were meeting the following morning, and he expected CFO Patronis' cabinet aide to nominate only one applicant - me - to be OFR commissioner. Mr. West said that doing so would send a strong signal to the other cabinet members that the CFO wanted me to be OFR commissioner.

Toward the end of the call, Mr. West said he had an important question to ask before preceding with the aforementioned plan: "Would you have a problem firing OFR's general counsel?" I assumed that the general counsel's work had been unsatisfactory, so I replied that if firing him was legal and appropriate, I would have no problem doing so. I said I knew many Florida lawyers from the six years I had practiced law in the state, and I would ask around to find a good attorney for the job. Mr. West replied, "No, you don't understand – we have someone we want for the job. Would you have a problem hiring that person?" I replied that I didn't have anyone in mind

1

EXHIBIT A

to replace the general counsel, so I had no reason to object to hiring whomever the CFO wanted me to hire, so long as that person was reasonably qualified and could do the job. Mr. West indicated he was satisfied with my answer, and we ended the call.

I was the CFO's only nominee, and the Florida Cabinet unanimously voted to appoint me OFR commissioner on February 26, 2019. Less than two weeks later, Mr. West asked me to stop by his office. After discussing a few OFR matters, he took a resume from his desk, made a copy, and handed me the original. The resume belonged to Kimberly A. Grippa. Mr. West informed me that Paul Mitchell had given him Ms. Grippa's resume, and he hoped I would interview her for the general counsel job (photos of Ms. Grippa's original resume are submitted with this statement). I scanned Ms. Grippa's resume and told Mr. West that she appeared to have little experience relevant to the general counsel job, but I would be happy to interview her. I returned to my office and asked YYYY, _____, to contact Ms. Grippa and arrange the interview.

A day or two later, Mr. Mitchell called me as I was driving to work. I asked how he knew Ms. Grippa and why he had given Mr. West her resume, since she did not seem qualified to be general counsel. Mr. Mitchell laughed and replied, "That resume didn't come from me, it came from Jimmy [CFO Patronis]." Mr. Mitchell went on to explain that Ms. Grippa's ex-husband, Tony Grippa, was a close friend and that Mr. Grippa had been fired from a high-level job at a big insurance company a few years earlier. As a result, he had moved from Daytona Beach to New York, where he currently lived. According to Mr. Mitchell, Mr. Grippa was planning to move to Tallahassee. His ex-wife Kim was still living near Daytona Beach, and he wanted her to get a job in Tallahassee and move there with their minor child. Mr. Mitchell said that CFO Patronis wanted me to hire Ms. Grippa as OFR general counsel so that Mr. Grippa could live in the same location (Tallahassee) as his child.

Ms. Grippa did not want to travel to Tallahassee for the interview and wanted me to meet her in Daytona Beach, which I thought was strange for a job applicant. I asked YYYY to inform Ms. Grippa that my schedule was too full for me to meet her in Daytona Beach, but I would be visiting OFR's Orlando office soon, so I could meet her in Orlando. Ms. Grippa did not want to do that either, and instead asked YYYY if I could meet halfway between Orlando and Daytona Beach. I had YYYY reply that meeting outside of Orlando would reduce the limited time I had to spend with OFR's Orlando employees, and I was unwilling to do so. Ms. Grippa finally agreed to meet for lunch in Orlando on March 21.

The interview did not go well from my perspective. Early in the lunch interview, I asked Ms. Grippa if she knew anything about me or had read any of my articles (I did so because interview preparation is a good indicator of an applicant's work ethic and interest). The question appeared to annoy Ms. Grippa. She replied that she had done no research on me, had read none of my articles, and knew very little about me. She asked me to write down the names of some of my articles, and she would try to read them later.

I suggested that Ms. Grippa just Google "Consumer Financial Protection Bureau," and the first or second search result would be a National Review article that contained a lot of information about me. She picked up her phone, typed quickly, scrolled for a few seconds, and said she couldn't find the article. I asked to see what she was looking at, and she handed me her phone. I said she

2

had misspelled the word "Financial." I quickly corrected the spelling, found the article, and handed the phone back to her. She put it on the table without looking at the screen.

NOTE: The description of this interaction in Ms. Grippa's May 13, 2019 email to Mr. West (which was published by the CFO's office on May 14, 2019) contains many inaccuracies. I did not "grab her phone out of her hand before she could finish typing," say her phone "looked like a mommy phone," or tell her she "needed to learn how to spell." I would never do any of those things, particularly when interviewing someone personally recommended by Mr. West. Assertions to the contrary do not withstand scrutiny.

Next, Ms. Grippa pulled a printout of OFR's organization chart from her bag and placed it on the table. She said she had reviewed the chart and would like to be OFR's deputy commissioner. I replied that I was reorganizing the agency and would be converting the deputy commissioner position to chief of staff. Ms. Grippa asked me to draw on her (current) chart a diagram of the new organization, and to show her where the current chart's managers would be in the new organization chart. I drew the diagram and said that several OFR senior managers had announced, or were expected to announce, their retirements soon. I said I had not yet decided which middle managers would replace the retirees in the new organization chart.

NOTE: The description of this interaction in Ms. Grippa's May 13 email is also inaccurate. I absolutely did not "point to three names and say they need to go because they were 'too old.'" Those three managers announced their retirements before or shortly after March 21. At least two other middle managers retired in April 2019. All of these retirements were 100% voluntary and were initiated by the employees themselves. Neither I nor anyone I know of requested or pressured these employees to retire. Furthermore, other than two disciplinary matters, no OFR employee has been terminated since I became commissioner. It is ridiculous to think that I would make such discriminatory comments to an interviewee whom I had just met and who had already made a negative impression on me. To the contrary, I told Ms. Grippa I was worried that the retirements would put additional pressure on my already overworked staff. I said I was particularly concerned because I had been relying heavily on one employee whom I expected to take maternity leave at the end of the summer. I did not say the employee was "already showing" signs of pregnancy.

I told Ms. Grippa that I hoped to create a new enforcement division and add several new enforcement attorney positions. I said it would be hard to find and entice experienced enforcement attorneys to move to Tallahassee and work for OFR salaries less than half their current salaries. I mentioned that a few former SEC and CFPB (federal) enforcement attorney colleagues in Boston, Atlanta and Miami had told me they would love to work for OFR, but could not afford the pay cut.

NOTE: The description of this interaction in Ms. Grippa's May 13 email is so blatantly false and inflammatory that that it must have been intentionally fabricated for the purpose of angering local readers. I certainly did not say I "couldn't find any smart people in Tallahassee as there were too many 'rednecks.'" Ms. Grippa did not scold me during the interview, and I do not recall either of us using the term "redneck." Based on a subsequent conversation I had with Mr. Mitchell, which I describe below, I believe he suggested or even dictated this part of Ms. Grippa's May 13 email (if not the entire email). Again, it is ludicrous to think that I would make such offensive comments to an interviewee that I had just met.

3

Ms. Grippa studied the diagram she had instructed me to draw and then asked me to identify the most important position in the new organizational structure. I said I considered the head of the enforcement division to be the most important OFR job after the commissioner's. She immediately replied, "Okay, I'll take that job."  I was stunned by her sense of entitlement and said that, based on the experience listed on her resume, enforcement director was the one job she could not be expected to perform. I explained that the person in that role would have to be an experienced litigator with some combination of expertise in securities law, consumer finance law, criminal law and banking law. She said only that she had administrative law experience, pointing out the environmental law work she had done between 1997 and 2001.

The interview was becoming uncomfortable for me because Ms. Grippa did not want to discuss the general counsel job for which she was interviewing, and she seemed indignant that I would even question her qualifications. Since Mr. Mitchell had told me she was the ex-wife of CFO Patronis' friend, I ended the interview politely by saying I would go through the organization chart and try to identify a position for which she would be a good fit, and then get back to her.

   NOTE: Ms. Grippa's May 13 email includes a grotesquely inaccurate description of our discussion about Governor DeSantis and the Florida Cabinet in a ham-handed effort to taint me before them. The truth is that I told Ms. Grippa in no uncertain terms I was extremely impressed with every Cabinet member and the job they had done so far.  I praised their individual initiatives to reduce financial fraud against Florida seniors (one of my top priorities) and said I would not be surprised if Governor DeSantis was elected President of the United States one day. I told Ms. Grippa that I had gotten to know every cabinet member except the governor through private meetings, and I had had several meetings with the governor's staff, who were also impressive.

I told Ms. Grippa that I could not thank Governor DeSantis enough for coming to a March 14 Palm Beach Alzheimer's fundraiser that my parents had helped organize (I introduced the governor before his speech), because he had used the event to announce an important Alzheimer's research initiative, and because he had brought so much joy to my parents, who are 84 and 82 years old.  Ms. Grippa's May 13 email claims that I "was happy that Governor DeSantis attended, but [I] was annoyed that the Governor did not recognize [me] when [we] saw each other at a subsequent event."  This statement is provably false. I did not attend another event with Governor DeSantis between March 14 and March 21 (the date of Ms. Grippa's interview).  In fact, the next time I was in the same room with Governor DeSantis was his speech at the Emergency Operations Center on May 8, 2019 (I did not speak with the governor). Again, it is farcical to think that I would have made disparaging comments about the governor and the Cabinet to an interviewee recommended by the CFO's chief of staff.

Around 8:30 pm on March 21, Mr. Mitchell called me to discuss Ms. Grippa's interview. It was our first unfriendly conversation, and he was bullying throughout the call.  He began by screaming, "I spoke with Kim [Grippa]. What the hell is wrong with you? She said you called her incompetent!"  I replied that I didn't say she was incompetent, but rather only that she was not qualified to be OFR's enforcement director. Mr. Mitchell snapped back, "Her qualifications are irrelevant.  You were just supposed to hire her!"

4

I explained that I had hoped to hire her, and I had not told her I wouldn't hire her because I thought I should speak with Mr. Mitchell before deciding what to do. I said that I needed a general counsel who could actually do the job. Furthermore, I told Mr. Mitchell that Ms. Grippa was so unpleasant, and had such an air of entitlement, that I feared she would make my staff and other OFR employees miserable.

Mr. Mitchell tried to put me on the defensive by accusing me of using the word "redneck" during the interview, which he said was racist. I was puzzled because I did not recall anyone using the word during lunch, and had trouble imagining how it might have come up during the interview. Based on this conversation, I suspect that Mr. Mitchell drafted or dictated parts of Ms. Grippa's May 13 email.

Recognizing that I was not interested in hiring Ms. Grippa, Mr. Mitchell said that she was no longer interested in working for OFR. He said he would find her a job at another Florida state agency. I was relieved that she would be someone else's problem, and thought I had heard the last of her.

### XXXX Complaint (Complaint 1)

Almost immediately after I was appointed OFR commissioner, I recognized that morale among the agency's employees was very low, in large part because the employees perceived the previous commissioner and acting commissioner to be autocratic and aloof. To remedy this problem, I have gone to great lengths to show OFR employees that I am a different kind of leader – friendly, approachable, and mentoring. I traveled to every OFR office around the state to hold "town hall" meetings in which I spent hours talking to, listening to, and getting to know the employees. I spent hours every weekend drafting weekly message emails to OFR employees that described in a conversational tone my previous week's activities, and illustrated the messages with appropriate, sometimes personal, photos.

I endeavored to set a similar tone in my own executive office. A personal topic I discussed frequently during informal conversations with my staff was my interest in interior design. I had put considerable thought and effort into painting and furnishing my Washington, DC apartment (the project distracted me during the eight month-long OFR appointment process). I often shared photos of my DC apartment's furniture and design with my staff and others who expressed interest, including the Department of Financial Service's chief of human resources management.

After my appointment, I decided to buy a second apartment in Tallahassee. I purchased an unfinished unit in the Plaza condominiums that required painting and installation of floors, baseboards, closet shelving, kitchen appliances, faucets, lighting, and other basic features. I chose to coordinate the various tasks myself. The condo "finishing" project was a periodic topic of conversation with my staff and others, including CFO Patronis. Four members of my staff (including my human resources administrator), and later _____ ZZZZ (who rents an apartment in the building), visited my unfinished apartment during April 2019.

I occasionally discussed with _____, XXXX, both the design of my DC apartment and the pre-habitation work being done on my Tallahassee condominium, which appeared to be of

5

interest to her. She had asked to see photos of the DC apartment, and her comments indicated knowledge of interior design.

_____, XXXX, who is studying _____ in the evenings, indicated that _____ she hoped to eventually move from the _____ position to a financial analyst-type job that would utilize her pending degree. To help her achieve these goals, I made a point of explaining substantive OFR issues to her whenever possible.  She seemed to appreciate my mentoring.

Several OFR employees told me that the previous commissioner's and acting commissioner's unreasonable rigidity regarding working hours had harmed morale, so I allowed my staff significant scheduling flexibility to deal with family and personal matters, and regularly granted permission to arrive at the office late or leave early to tend to family obligations.  I informed XXXX of my approach to such issues. Specifically, _____ she said she had stopped going to the gym because working out in the morning would cause her to arrive at the office at 8:15 am rather than 8:00 am. I gave her permission to begin work at 8:15 am, and said she should let me know if anyone told her she could not do so.

During _____, YYYY advised me that I should take XXXX to lunch. I followed the advice, but to make it clear I had no inappropriate intentions, I invited her by saying, "YYYY says I should take you to lunch."  I believe XXXX appreciated the invitation and enjoyed the lunch.

I was traveling for work on _____, which was _____. When I returned to the office, I saw flowers on XXXX's desk and realized that I had forgotten. I apologized to her and offered to take her to lunch the next week, which is something I would typically do _____. She agreed and chose Harry's Restaurant (I had never been there) for the following Monday.

I was pushing my painter and other workers to make my new apartment habitable by May 1 to avoid renting a temporary apartment in May. On our walk to Harry's, which is just feet from the Plaza condominiums, I asked XXXX if it would be alright if I stopped at the Plaza for five minutes to see if my painter had painted the baseboards that morning, as promised. She said that would be fine, and I asked if she wanted to see the apartment that we had discussed previously, as opposed to waiting in the lobby alone downstairs. Without hesitation, XXXX said she would like to see the apartment. At no time did she express or display any discomfort.

I explained to XXXX that the hallway was covered in concrete dust and I did not want to track hallway soot over newly cleaned floors, so asked if she would mind removing her shoes inside the doorway. She said she did not mind, and she exhibited no signs of discomfort. If she had, I would have gone into the apartment alone.

Although no workers were present, the door was propped open and remained that way the entire time XXXX was there. There was no furniture in the apartment except a recently delivered mattress wrapped in several layers of heavy shipping plastic to protect it during the messy finishing work. I walked through the rooms at a brisk pace, ahead of XXXX. I opened the sliding door and

6

waited inside while XXXX went out on the balcony to see the view. I estimate we were inside the unit for no more than three minutes. While there, I called the painter to say that the baseboards still had not been painted, and we proceeded to Harry's. I viewed the stop as innocuous.

During lunch (which wound up being at Andrew's because Harry's could not seat us), XXXX discussed her family and her father's illness and then asked about my siblings. I said that my sister's son had recently died of cancer. In an attempt to lighten the mood, I told a family anecdote, which I have told many people over the years, that ends with my father unexpectedly answering a question, "Your mother and I were very fertile," followed by my quip that it took years of therapy to unhear that answer. My intention was not to make XXXX uncomfortable, but rather to tell a self-deprecating family story after our downbeat discussion of family illnesses. She gave no indication that this brief anecdote made her uncomfortable.

During lunch, the painter sent me a text message saying that the baseboards would be painted by 1:45 pm. When XXXX and I left Andrew's around 2:00, I asked if she would mind my stopping by the apartment on the way back to the office to see if the baseboards had been painted. She said that she did not mind, and we rode up the elevator. I asked her to wait by the elevator while I walked down the hall and checked the apartment. I neither wanted nor asked XXXX to go back inside the unit with me – it was absolutely clear that I would go to the apartment by myself and check the baseboards. The painter arrived at that time, and I spoke with him inside the apartment for a few minutes while XXXX remained by the elevator. She and I then walked back to OFR; I stopped into a building near OFR for a meeting and she returned to OFR.

XXXX never told me and gave me absolutely no indication that anything I said or did that day, or at any time prior or since, was inappropriate or had made her in any way uncomfortable. It disturbs me greatly to think that what I viewed as innocent interactions may have caused her any amount of distress.

XXXX's complaint summarizes a brief conversation we had the following day about potential travel to Washington. I was not aware that this conversation had made her uncomfortable until I read her complaint, and I am not sure the conversation actually took place on April 30. I do recall that XXXX had previously told me she would like to visit Washington, DC, and that the conversation took place immediately after _____ had informed me that the organizers of a Washington securities conference I was scheduled to attend in mid-May provided a free hotel room, but that she had not requested one because she knew I preferred to stay in my own Washington apartment. Moments later, I passed XXXX in the hall, and told her I had just learned that my May conference entitled me to a free Washington hotel room that I wasn't planning to use, and that, if she liked, I could check and see if it would be appropriate for her to attend the conference and stay in the hotel room while I stayed in my apartment. As noted earlier, I encouraged XXXX to involve herself in OFR policy matters so she could ultimately achieve her goal of using her _____ degree in a _____ OFR job.

XXXX said she preferred to visit Washington as a tourist. I replied that in that case, she was welcome to borrow my apartment if she decided to do so, and I would be happy to lend her my keys. It was absolutely clear that I was offering her the use of my Washington apartment while I was in Florida so she would not have to pay for a Washington hotel, and I considered the offer to

7

be one of kindness and generosity. I would have made the same offer to any friend or co-worker I could trust not to damage the apartment. XXXX neither said nor did anything to indicate that my offer had made her uncomfortable.

    At 1:07 pm on Tuesday April 30, Mr. West, CFO Patronis' chief of staff, sent me a text message asking that I stop by his office at 3:00 pm. The tone of the message concerned me, so I called him. He said he wanted me to meet with him and Mr. Mitchell, but would not disclose the topic. I then asked Abby Vail, my new chief of staff, if I had said or done something to make someone angry. Ms. Vail informed me that XXXX had told her our lunch had made her uncomfortable, and that she no longer wanted to work for me. I was shocked and mortified, as I told Ms. Vail.

    I went to Mr. West's office at 3:00 pm. Mr. West looked for Mr. Mitchell but said he could not find him. Mr. West and I discussed XXXX's discomfort. Mr. West also raised Ms. Grippa's interview, and I informed him that nothing I said to Ms. Grippa was inappropriate, that she had not even pretended our lunch was a real interview, and that she was angry because I had treated it as a real interview.

    Based on both Ms. Vail's and Mr. West's descriptions of XXXX's conversation with Ms. Vail, I believe that XXXX had not approached Ms. Vail to file a formal complaint. Rather, it appeared that some incident in her past presented a concern and she was worried that I might develop a romantic interest in her and wanted to avoid that scenario. While discussing the incident with both Ms. Vail and Mr. West, I assured them that I had no such interest and was sorry that the situation had been misconstrued. I informed them that I believed one reason I had not anticipated XXXX's discomfort with my family anecdote was cultural – Jewish people, especially those from New York (like me), often tell family stories like those I had told during our lunch. Both Ms. Vail and Mr. West dismissed that suggestion.

    After I returned to my office, I discussed with Ms. Vail the best way to handle the situation. Since XXXX had not indicated that she wanted to file a formal or informal sexual harassment complaint, but only that she was uncomfortable working for me, I suggested we offer her the opportunity to move to another OFR position that she found appealing. I asked Ms. Vail to inform XXXX that I was very sorry I had unintentionally made her uncomfortable, and that I would in no way, at no time, think less of her or retaliate against her for expressing her discomfort. I asked Ms. Vail if she thought such a reassignment could be accomplished in a way that did not reflect negatively on XXXX. Ms. Vail said she believed that doing so was possible, and would be a good course of action. Ms. Vail instructed XXXX to stay home the next day, May 1. She informed me that she would work with _____ AAAA to reassign XXXX while I was in Miami for a white-collar crime conference and other meetings the next two days.

    I was in my Miami hotel room that same evening of May 1 when I received a telephone call on my cell phone from CFO Patronis. He said he was in his Plaza apartment and wanted me to come downstairs (from my apartment) to meet someone. I told him I had just arrived in Miami. He did not seem to be aware of XXXX's concerns when he called me. I was hopeful that the issue would be resolved satisfactorily for all concerned.

On Thursday, May 2, at 12:02 pm, Mr. Mitchell sent me the following text message while I was in the white-collar conference: "We have to talk. Not good. Please call me when you have some time by yourself. Thanks." I was so shaken up by the message that I immediately stepped out of the conference and called him. Mr. Mitchell's tone was bullying and abusive, like he had been during his call after Ms. Grippa's interview. He began by saying that I had acted inappropriately during the Grippa interview, that I had taken _____ up to my apartment, and that I "might know technical things, but I was not very smart." He told me that the decision had been made to fire me. I had until the next day to resign, and that was not negotiable. He said that if I did not immediately resign, XXXX would file a sexual harassment complaint, it would be made public, and the Cabinet would call an emergency meeting and fire me without hearing my side of the story.

On that call, Mr. Mitchell also said he had drafted a resignation letter from me to the governor explaining that I was resigning to take care of my ill parents, and he would email it to me as soon as we got off the phone. He said I had no choice - the decision had been made. If I did not resign by Friday, I would not have an opportunity to defend myself, and I would be publicly humiliated. I told him I would not resign. He said I should read the letter he was about to send, and then hung up. He emailed me the letter minutes later; the email's subject was "alzheimers" (the letter is included with this submission).

I quickly sent Mr. West a text message, and left him a voicemail asking that he call me. He replied that he would call me later. He called back at around 4:00 pm., and was surprisingly friendly. I began by saying, "I assume you've spoken with Paul [Mitchell]?" Mr. West said he had not, and was clearly confused. I said Mr. Mitchell had told me I had to resign by Friday. Mr. West's friendly tone immediately changed, and he said that if Mr. Mitchell said I had to resign, I had to resign. Mr. West repeated several times that I had invited _____ up to my apartment. Every time I tried to remind him of the benign circumstances, he replied that they were irrelevant - I had invited _____ up to my apartment.

At about 5:00 pm, I was surprised to see an email Ms. Vail had sent to OFR senior managers and my executive staff, copying XXXX and me. The email informed the recipients that XXXX would now be working _____. I quickly called Ms. Vail, who informed me that Mr. West had approved the reassignment plan, and that she and AAAA had executed it together. Ms. Vail said XXXX seemed to be happy with the way everything had been handled. It was obvious to me that Mr. West had decided Ms. Vail's plan to transfer XXXX to another job and diffuse the situation was the best course of action, and Ms. Vail and AAAA had successfully executed the plan, until Mr. Mitchell intervened. I believe that Mr. Mitchell took steps to encourage XXXX to file a sexual harassment claim after Mr. Grippa became aware of XXXX's concerns and insisted they be used to remove me from office, either as retribution for not hiring his ex-wife, or so that the next OFR commissioner would hire Ms. Grippa.

On Monday, May 6, I asked Mr. West to meet with me, which he did. I reiterated that I had no idea I had made XXXX uncomfortable, apologized profusely, and said that Ms. Vail and AAAA had informed me that XXXX seemed to be happy in her new job. I said I would be very careful to ensure that nothing I said or did could be misinterpreted or make anyone uncomfortable in the future, and offered to take sensitivity training at my own expense.

9

I said that I would not resign, and that I wanted to tell the inspector general the whole story. Mr. West pressed me to explain what I meant, and I said that Mr. Mitchell's claim that I had acted inappropriately with Ms. Grippa was contrived. I said that Mr. Mitchell had acted unethically, if not illegally, by insisting that Ms. Grippa's qualifications were irrelevant, and that I was just supposed to hire her. Mr. West replied, "Forget about Kim. And you didn't hire her anyway, did you?"

Over the next week, AAAA advised me on a daily basis that she checked in with XXXX and as far as she could tell XXXX was pleased with her new position and doing well. I was comforted by that information.

On Wednesday, May 8, Mr. Mitchell, obviously angered that I had not resigned, sent me a text message (see screenshots submitted with this statement) with an implicit threat that he would call my father and tell him about the sexual harassment allegation: "Started to call your dad to check with him - thought about it and hit pause as I wasn't sure you had shared all that's going on with him or not..Once the process starts, there's nothing anyone can do to stop it or reverse it...If you'd like to talk, I'm here."

I replied to the text and said that I would be happy to talk in person, but I did not want to talk on the phone. I did so because he had been so abusive in our last conversation, and I did not think he would be able to act that way in person.

The next day, May 9, Mr. Mitchell sent several more text messages asking that we talk. I repeated that I did not want to talk on the phone, but I would speak to him in person. Finally, he sent a text message explicitly threatening to call my father: "It's time for you to pick up the phone and call your dad - or I will. It is unfair for your parents, who are such lovely people, to find out after the news has broken." I did not respond.

On Friday, May 10, Ms. Vail informed me that XXXX was filing a sexual harassment complaint and that CFO Patronis would publish it the next day. However, Ms. Vail said that none of this would happen if I resigned. I refused to do so. She spent at least 15 minutes trying to convince me to resign. XXXX's complaint was filed on May 10 - twelve days after our lunch, and eight days after she had been moved to another job without incident. I believe XXXX was manipulated at the behest of Mr. Mitchell and Mr. Grippa in an obvious attempt to increase the pressure on me to resign because I had refused to hire Ms. Grippa. I also believe that the public release of Ms. Grippa's email to Mr. West, and the ensuing media campaign against me, including an article that incorrectly reported that I had falsified my resume, and that I had been fired from my last job for sexual harassment, are part of the same unscrupulous pressure tactics, likely at the direction of Mr. Mitchell.

In an obvious effort to increase the pressure, on Wednesday, May 22, at 1:28 pm, Mr. Mitchell sent my 84 year-old father a text message. Mr. Mitchell had never called or texted my father, and I do not know how he obtained my father's cell phone number. Mr. Mitchell's message said that I had not taken his friendly advice, and that he thought I "might have one last chance to best deal with this." The message included Mr. Mitchell's phone numbers and asked my father to

10

call him. My father did not respond (a screenshot of the text message is submitted with this statement).

At 4:58 pm that day, Mr. Mitchell called my father's cell phone. During the call, which lasted over 15 minutes, Mr. Mitchell said I had made many inappropriate statements and committed many inappropriate acts, any one of which might be explained, but when taken together made me unqualified to be OFR commissioner. My father's assistant, who was listening to the call on speakerphone, asked about Ms. Grippa. Mr. Mitchell did not respond, and quickly changed the subject. Mr. Mitchell said the Cabinet would meet on June 4 and that the Cabinet members had already decided to fire me at that meeting. He said there would be reporters at the meeting, I would be present, and I would be publicly humiliated. He said that all of this could still go away quietly if I resigned. Following the call, my father's assistant helped my father block Mr. Mitchell's phone number.