Filing # 101202022 E-Filed 01/06/2020 06:01:49 PM

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA
CIVIL DIVISION

RONALD RUBIN,                          CASE NO. 2019 CA 002535

        Plaintiff,

vs.

R. PAUL MITCHELL,

        Defendant.

_____/

## SECOND AMENDED COMPLAINT

Ronald Rubin sues R. Paul Mitchell, and alleges:

## Overview

1.     Florida's Chief Financial Officer (CFO) Jimmy Patronis and his inner circle, including lobbyist Paul Mitchell, constitute an "enterprise" designed to consolidate their political power and advance their financial interests.  The enterprise applies a "Pay to Play – *or Else*" system of blackmail and intimidation to extract illegal campaign contributions, install loyalist patrons and eliminate "outsiders" who might expose their unlawful activities.  When state employees refuse to fall in line, Patronis uses his official press office and other media vectors to extort their resignations with defamatory allegations or fires them outright so they can be replaced with obedient foot soldiers.

2.     In early 2019, Plaintiff Ronald Rubin, an outsider to Patronis' political machine, was appointed Commissioner of the Florida Office of Financial Regulation (OFR).  Prior to this appointment and unbeknownst to Rubin, Patronis' enterprise had extracted a $1 million campaign-contribution pledge

from Rubin's 84-year-old father.  However, Rubin's father broke his promise and Rubin refused to fill official state positions with known enterprise members.

3.      Consequently, the enterprise blackmailed Rubin, threatening to publicly accuse him of sexual harassment if he did not immediately resign. Indeed, in 2018, Patronis had forced the resignation of Rubin's predecessor using similar tactics.  Rubin, unlike his predecessor, denied the false allegations and refused to quit.

4.      Patronis then published a "complaint" against Rubin that his staff had carefully orchestrated, falsely calling it a "sexual harassment complaint." Next, he suspended Rubin without lawful authority (a defect the Attorney General promptly pointed out and which Patronis ignored) and solicited additional complaints against Rubin.  Finally, Patronis conducted a sham, pre-ordained "investigation" of Rubin.

5.      Patronis hid his involvement in the investigation from the Governor, the other Cabinet members and the public.  He ultimately reported that Rubin had violated "policies prohibiting sexual harassment" – ***but he concealed the purportedly victimized employee's testimony showing that Rubin had never sexually harassed her***.  As a result of Patronis' knowingly false accusation, Rubin was vilified by the media, publicly humiliated, and fired by the Cabinet.  To intimidate Rubin from pursuing whistleblower claims or other civil relief, Patronis publicly declared that Rubin and his lawyers should be ***criminally prosecuted*** and sanctioned.

6. Consequently, Rubin sues here under Florida law for defamation, tortious interference and civil relief from the enterprise's criminal acts.

### Parties

7. Plaintiff Rubin is an individual residing in the District of Columbia. He is a lawyer with decades of federal public service including at the Securities and Exchange Commission, the Consumer Financial Protection Bureau and the House of Representatives' Financial Services Committee.  He served as OFR Commissioner from February 26, 2019 to July 25, 2019.

   a. OFR regulates Florida's banking, finance and securities industries.

   b. OFR is a sub-agency of the Department of Financial Services (DFS), which is part of Florida's Executive Branch.  CFO Patronis is the chief executive of DFS.

   c. Also within DFS is the Financial Services Commission (FSC), whose members are the Governor and the "Florida Cabinet," namely, CFO Patronis, Attorney General Ashley Moody and Agriculture Commissioner Nikki Fried.

   d. The FSC has the power to appoint and remove the OFR Commissioner by a majority vote consisting of at least three affirmative votes, with both the Governor and the CFO on the prevailing side.

8. Defendant Mitchell is a citizen of Florida.  He is a registered Florida executive and legislative lobbyist at The Southern Group f/k/a Southern Strategy Group, a lobbying firm with offices throughout the state.  Mitchell's company boasts "unparalleled access to local and state government."  For over a decade, Mitchell's customers have included insurance companies, including Managed Care of North America, Inc. d/b/a MCNA Dental Plans, operated by

Jeffrey Feingold, DDS.  From 2016 to date, Mr. Feingold's companies have paid over $815,000 in putative "lobbying fees" to Mitchell and his firm.  In 2017 and 2018, Mitchell and his family "donated" $10,000 to Patronis' election campaign, and Mr. Feingold and his family "donated" $6,000.

### Jurisdiction and Venue

9.      This is a civil action for damages in excess of $15,000.00.

10.     Venue is proper in this Court because Defendant resides in this Circuit and a substantial part of the events or omissions giving rise to the claims occurred in this Circuit.

### Rubin's Appointment as OFR Commissioner

11.     In June 2018, OFR Commissioner Drew Breakspear announced his resignation after Patronis, through his press office, accused Breakspear of "complete lack of ability to do the basic things he needs to do as a commissioner" with respect to a sexual-harassment allegation (which was ultimately disproven). During that episode, Breakspear's Deputy Commissioner Pamela Epting publicly disobeyed a Patronis order and Patronis moved to fire and replace her with a Patronis loyalist.   According to public records, Patronis' effort to remove Breakspear came after Breakspear had clashed "with scorned companies and high-profile securities traders who lobbied Patronis after disagreements with Breakspear's office."

12.     Shortly thereafter, Rubin applied for the OFR Commissioner position that Breakspear had vacated.  An outsider to the Tallahassee political establishment, Rubin sought assistance in navigating the application process,

and ultimately was introduced to lobbyist Mitchell through insurance magnate Feingold. In August 2018, Mitchell sent Rubin a text in which he revealed that he purposefully violated the Sunshine Law ("creating a public record") in his dealings with Patronis:



13.    In exchange for Feingold's "assistance" in ensuring Rubin's appointment, Feingold solicited a $1 million contribution from Rubin's father. Rubin advised Feingold that he would not seek the post if Feingold continued to link the job to a financial reward. Although Feingold told Rubin he would desist, Feingold later – without Rubin's knowledge – told Rubin's father, "I'm going to get your son the job but understand, you will owe me."

14.   In February 2019, after Patronis nominated Rubin for the position, the Governor and Cabinet – acting as the FSC – voted to install Rubin as OFR Commissioner.

### Rubin's Refusal to "Play Ball"

15.   Immediately after Rubin's appointment, Mitchell texted Rubin instructing him to thank Feingold – who was not a State employee – for Rubin's appointment and suggested that Rubin's father contribute money.  Shortly after, Feingold personally renewed his request that Rubin's father satisfy his pledge to "contribute" $1 million.



16.   A week after Rubin's appointment, Patronis – acting through Mitchell and DFS Chief of Staff Ryan West – asked Rubin to fire OFR's General Counsel and replace him with Kimberly Grippa, a paralegal-studies teacher at Daytona (Beach) State College, whose ex-husband Anthony ("Tony") Grippa is

Mitchell's college friend.  In 2017 and 2018, Mr. Grippa "donated" $6,000 to Patronis' election campaign.

17.  In March 2019, Rubin interviewed Ms. Grippa and concluded that she was unqualified for the position and that he did not want to hire her.  (When Rubin shared his thoughts with Mitchell later that evening, Mitchell yelled at Rubin, "What the hell is wrong with you?  Her qualifications are irrelevant!  You were just supposed to hire her!")

18.  Just two days earlier, Rubin's father had texted Feingold refusing Feingold's *quid pro quo* demand for campaign contributions.

19.  Rubin and his father's refusal to "play ball" rendered Rubin *persona non grata* to the enterprise.

## Retaliation Against Rubin

### *Rubin is set up.*

20.  Within a week, Mitchell set in motion a plan to remove Rubin from office.  He instructed Rubin to interview Abigail Vail for the position of OFR Deputy Commissioner (to be renamed Chief of Staff), insisting that no one else be present for the interview.  Mitchell's asserted reason was that Vail would be replacing long-time Deputy Commissioner Pamela Epting, who, as Mitchell texted, Rubin "would be essentially firing" (and who, as noted in paragraph 11 above, had publicly crossed Patronis).  Rubin texted, "This is making me uncomfortable," but did as Mitchell requested:



21.    The interview was friendly, lasting three hours, during which **Vail**
asked Rubin a litany of questions about his personal life.  Later that day, Mitchell
texted  Rubin,  reporting  that  Vail  had  told  him  the  interview  "went  great!
😀😀😀."



8

22.     As discussed below, at the enterprise's direction, Vail would shortly change her account of that interview 180 degrees.

23.     Unaware that he was being set up in retaliation for his refusal to "play ball," Rubin hired Vail and she began working on April 22.

### Rubin's "awkward" lunch.

24.     On April 29, Rubin took an employee (herein, "EE") to lunch for a belated "[Employee Appreciation] Day" celebration.  As part of their "small talk" over lunch, Rubin talked about his family and asked EE about hers.  On the way to and from lunch, at Rubin's request – but not his insistence – they stopped by to check on contractors who Rubin had hired to paint and refinish a nearby unfurnished condominium.  On the stop after lunch, Rubin told EE to wait by the elevator while he checked on the condo.

25.     On April 30, West and Vail told Rubin that EE felt awkward working for Rubin, based on the lunch.  They did not tell Rubin that, prior to the lunch, EE had asked Vail to be reassigned because EE was having difficulty completing her assigned job responsibilities.  On May 2, Vail and West reassigned EE to a different job, reporting directly to Vail.  In her new position, EE worked four floors away and had no further interaction with Rubin.  Throughout the next week, the OFR Resource Management Administrator repeatedly told Rubin that EE was fine and doing well in her new role.

### Rubin is blackmailed to resign or face public humiliation.

26.     On May 2, Mitchell – who was not a State employee – told Rubin that both Vail and EE had complained about Rubin and that EE would be filing a

***sexual harassment*** complaint if Rubin did not immediately resign.  Mitchell

then emailed to Rubin a draft resignation letter he had prepared, reciting fake

reasons for Rubin's resignation.



Knowing he had not sexually harassed anyone, Rubin refused to sign the false

letter and refused to resign.

27.    Upon learning at the close of business on May 2 that Mitchell had

insisted that Rubin resign, and later during lunch on May 6, West echoed

Mitchell by insisting that Rubin resign.  When Rubin repeated that he had no

intention of resigning, West responded, "So you don't care if sexual harassment

allegations against you are made public?  Okay."

28.    On May 3 and then again on May 6, assisting the enterprise, Vail

pressured Rubin to resign to avoid a sexual harassment complaint.   Vail

disclosed that Mitchell and Patronis were very close and that Mitchell almost

certainly was speaking for Patronis.  Rubin told Vail that he hadn't sexually harassed EE and refused to be blackmailed into resigning.

### *The blackmail intensifies.*

29.     On May 6, Mitchell texted Rubin: "This isn't a debate you can win or lose – it's just the simple reality of where things are":



30.     On May 8, Mitchell texted Rubin again: "Started to call your dad to check with him – thought about it and hit pause as I wasn't sure you had shared all that's going on with him …. Once the process starts, there's nothing anyone can do to stop or reverse it."  Rubin pled, "Please do not contact my father."



31.    Mitchell continued to pressure Rubin on May 9, texting, "It's time for you to pick up the phone and call your dad – or I will. It is unfair for your parents, who are such lovely people, to find out after the news has broken.[1] I tried warning you, but you refused to listen. You have brought this on yourself."

---

[1] "[I]n government and journalism people don't say 'Do it my way or I'll blow you up.'  Their language and approach are more rounded.  They imitate 1930s gangster movies in which the suave mobster tells the saloon keeper from whom he's demanding protection, 'Nice place you have here, shame if anything happened to it.'" Peggy Noonan, Opinion, *Impeachment Is Getting Real*, WALL ST. J. (Oct. 31, 2019, 6:37 PM), https://www.wsj.com/articles/impeachment-is-getting-real-11572561439.

### *May 10:  The enterprise follows through on its blackmail.*

32.     Around 10:00 a.m. on Friday, May 10, Vail told Rubin that EE would be filing a sexual harassment complaint and that Patronis would promptly publish it, but that that wouldn't happen if Rubin resigned.  Again, he refused to do so.

33.     Later that day, and despite that EE's requested reassignment had resolved any concerns she may have had, Vail convinced EE to reduce to writing a complaint about the "awkward" lunch 12 days earlier, so that the complaint "was in [her] own words telling [her] story when we send it over to DFS."

34.     That afternoon, true to the extortionate threats by Mitchell, Vail, and West, EE wrote up a complaint and gave it to the OFR Resource Management Administrator, who forwarded it to Vail at 3:52 p.m.

35.     At 4:00 p.m., DFS General Counsel Peter Penrod emailed that Rubin should be suspended based on "the nature of the allegations against [him]."  Less than an hour later, West directed Vail to email EE's complaint to Patronis. Shortly after, Rubin was suspended.  Later that same day Penrod reversed Rubin's earlier refusal to hire Kimberly Grippa and offered her a deputy counsel position, reporting directly to Penrod (who reports directly to Patronis).

36.     At approximately 8:00 that evening, Patronis issued a press release and published EE's complaint on the internet ***without EE's knowledge or permission***.  Patronis labeled the complaint "sexual harassment," despite that it did not allege any facts constituting sexual harassment under Florida law, federal law or DFS's internal policies.  Later, EE retained a lawyer who asked

Florida Attorney General Moody to investigate Patronis for this criminal violation of Florida's Sunshine Law that destroyed her privacy.  But Patronis' benefactor Jeffrey Feingold had recently contributed $30,000 to the Attorney General's election campaign -- and Moody officially declined to investigate.

### **The Sham "Investigation" and Rubin's Resulting Termination**

### ***Patronis oversees a sham "investigation."***

37.     To control the outcome of the investigation but hide his hand in it, Patronis orchestrated a plan for "my Office of Inspector General" to conduct the investigation but to make it look to the Cabinet and the public that the investigation was being handled by a different department.

38.     Thus, just after noon on Tuesday, May 14, OFR IG Bradley Perry emailed Patronis' own IG that "this review would be most appropriately handled in conjunction with" DFS and that he wanted to discuss the "next steps."

---

**From:** Perry, Bradley
**Sent:** Tuesday, May 14, 2019 12:08 PM
**To:** Harper, David <David.Harper@myfloridacfo.com>
**Cc:** Shoaf, Mike <Michael.Shoaf@myfloridacfo.com>
**Subject:** UNREDACTED - OFR OIG Preliminary Inquiry #19069

David

As we have discussed, the OFR has received allegations against OFR Commissioner Ronald Rubin. I have completed my initial review of the attached complaint and would like to request investigative assistance into OFR OIG Preliminary Inquiry #19069.

Given my own reporting structure in the agency, and Commissioner Rubin's appointment by the Florida Financial Services Commission, I have conferred with the other principal OIGs, and believe this review would be most appropriately handled in conjunction with your office.

As a reference, attached are documents related to the complaint and an MOI conducted yesterday. I'm including a separate notification received by the agency.

When your team is available, I'd like to have a discussion about next steps.

---

39.   Patronis' OIG Chief Investigator Mike Shoaf immediately emailed back that his boss' agency would be "happy to assist."

| | |
|---|---|
| **From:** | Shoaf, Mike |
| **Sent:** | Tuesday, May 14, 2019 1:26 PM |
| **To:** | Perry, Bradley |
| **Cc:** | Harper, David |
| **Subject:** | RE: UNREDACTED - OFR OIG Preliminary Inquiry #19069 |

Bradley,

We will be happy to assist.  We have generated DFS OIG Case 19013 MS to document our assistance with these matters.

40.   With remarkable alacrity, just two hours after OFR IG Perry's email suggesting coordination, ***DFS staff*** began interviewing EE under oath.  Over the next two months, DFS OIG investigator Shoaf interviewed 9 additional witnesses. ***The only interview that Perry conducted alone was the interview of Rubin***, on July12.[2]  This was a ruse that the enterprise apparently foisted on OFR IG Perry to hide that Patronis – not an independent IG – was running the investigation.

41.   All told, Patronis' self-serving emergency investigation of a non-sexual-harassment complaint about a single "awkward" luncheon subjected 11 state employees to over 24 hours of formal interviews totaling over 870 pages of transcribed testimony.   It was a Machiavellian diversion of valuable Florida resources designed to serve Patronis' personal political and financial aspirations.

---

[2] Perry also conducted one witness interview but Shoaf monitored the entire conversation by phone.

### *Knowing that no "sexual harassment" had occurred,*
### *Patronis hid the truth from the Governor, the Cabinet and the public.*

42.     When Patronis' OIG interviewed EE on May 14, she testified unequivocally that **Rubin had never touched her or sent her any inappropriate communications** and that his behavior was merely "eccentric."

43.     Indeed, immediately after the lunch EE told her co-worker, "I don't think I was in any danger or anything, going to his apartment or being around him … he never said anything … that made me feel that way.  And plus, I think he's gay anyway.  So I don't think he wants me."  As EE explained, "[H]e thinks we're friends [but] I don't want to be friends with a 56-year-old man."

44.     The day after EE's interview, the co-worker reported EE's statements to Patronis' IG and also told the IG that she never heard Rubin say or do anything inappropriate and was "shocked" and "surprised" that EE's lunch with Rubin was being characterized as sexual harassment.  Importantly, this co-worker also testified that, in the period leading up to the lunch, EE was "having trouble" performing the main functions of her job, to the point that she actually cried about it in the office.  In furtherance of his unlawful scheme, Patronis and the enterprise hid the truth about EE's complaint from the Governor, the Cabinet and the public.

### *Patronis tries to gin-up more complaints.*

45.     Despite that EE had testified that Rubin had not sexually harassed her, Patronis' office issued another press release after her interview, stating, "Following … Patronis' call for an immediate investigation into … Rubin, two additional complaints have been received."  Patronis also "encourage[d] all

individuals with any information relevant to this investigation conducted by the Department of Financial Services Office of the Inspector General to please come forward."

46.    Once again, these two new "complaints" had nothing to do with sexual harassment:

    a.    The first was an inside job, a May 13 email from a lawyer to Ryan West stating that Rubin had been rude (not sexually harassing) during her job interview.  Patronis redacted the sender's name to hide from the Governor, Cabinet and public that she was Kimberly Grippa – Mitchell's close friend, whom Rubin had refused to hire but to whom, just three days earlier, Patronis' lawyer had offered virtually the same job.

    b.    The second (also an email) reported that Rubin had made a "potentially unprofessional" comment during a welcome speech to a regional OFR office.  The sender, however, was honest and careful to point out that the comment appeared to be "a mistake that was made with good intentions" by Rubin, who "seemed nervous" giving the speech.

47.    To assist Patronis' sham "investigation," early the next morning, OFR Communications Director Jamie Mongiovi forwarded Patronis' press release to all OFR division heads, asking them to "share [it] with [their] teams."

### *Patronis' false and misleading "preliminary report."*

48.    Just a week after Patronis had published EE's complaint on the internet, Patronis' IG issued a "preliminary report" to the Governor and Cabinet members.  (At this point, no one had even informed Rubin that this report included new complaints against him, much less given him a chance to respond.) The "report" omitted any reference to the unequivocal exculpatory testimony discussed above.  One of the interviews the report did cite was OFR Chief of Staff Vail (whom Rubin had recently hired on Mitchell's recommendation).   Vail

concocted an utterly false narrative about her job interview with Rubin, evidently forgetting that she had texted Mitchell immediately after the interview that it "went great! 😀😀😀."

### Coordinating for the enterprise, Mitchell and Feingold Ratchet up the blackmail by calling Rubin's father.

49.     On May 22, Mitchell called Rubin's elderly father, boasting about confidential information, including the Governor and Cabinet's future decision:

    a.    The Governor and Cabinet had **already decided** to fire Rubin at their next meeting because they lacked "confidence in his ability to run the agency" and Rubin would be publicly humiliated.

    b.    There were "several different incidents," only some of which had been reported, and that Mitchell did not believe there was a single one that Rubin could not live through but that, because there were "so many" allegations that had been "offered up, some of which have been fully investigated and some of which haven't," Rubin was "not going to live through this."

    c.    Rubin could avoid all of this if he quietly resigned.

50.     That same day, Feingold also called Rubin's father and unleashed a furious, epithet-ridden rant, claiming that he was responsible for Rubin's appointment, complaining that Rubin had not called to thank him, and admitting that Rubin's father had refused to make a quid pro quo campaign contribution.

    a.    Among other things, Feingold told Rubin's father:

        i.    "I helped recommend your son to get the best job in the country and he f---ed it up."

        ii.    "I knew about it right away.  It came to me."

iii.   "I'm sorry I ever met you to get me into this b---s---, and you will go to your f---ing grave, you and your wife, knowing that your son is a sexual predator and screwed everybody who helped him."

iv.   "When I called you for a campaign contribution for a couple senators, … you didn't even have the courtesy to call me.  I made a phone call to you and you didn't return the call."

v.   "[Y]ou are going to donate this money to the Smithsonian?  Wait until they find out that the donor's son is a sexual predator."

b.   At one point in the discussion, Feingold's wife interjected, linking Mitchell and Patronis in the scheme and claiming that the Feingold family was paying for the Cabinet's upcoming trip to Israel:

i.   [Mrs. Feingold:] "You should not have put my husband in an awkward position and Paul Mitchell in a very awkward position.

ii.   [Mr. Feingold:] "And Jimmy Patronis and the Governor."

iii.   [Mrs. Feingold:] "It embarrasses us.  We are going to be with them this weekend in Israel.  We are taking them to Israel and it's an embarrassment."

### *Rubin tries to defend himself and the enterprise strikes back.*

51.   On May 28, Rubin sent IG Perry a written statement refuting the putative "complaints" that Patronis had published on the internet.  In response, Patronis issued another press release, demanding Rubin's immediate resignation and stating that Patronis would remove Rubin himself without a Cabinet vote if he could.

52.   In June, Rubin filed this lawsuit, exposing the enterprise, its members, and its scheme.

53.     In retaliation, Patronis escalated with two more press releases, containing blatantly false statements:

      a.    The first demanded Rubin's immediate termination and falsely stated, "Rubin and his associates have publicly disparaged victims."

      b.    The second falsely stated that "Rubin released the cell phone numbers and social media accounts of complainants."

***Patronis engineers a 3-1 vote to fire Rubin based on false evidence.***

54.     The OFR IG interviewed Rubin on Friday July 12.  The next business day, the IG released a four-page "executive summary" report finding that, although Rubin had ***not committed any act amounting to sexual harassment under Florida or federal law***, he purportedly had "violated agency policy prohibiting sexual harassment and discrimination."[3]  The report did not include any of the interview transcripts, which would have revealed to the Cabinet and the public that Rubin had not even violated agency policy.

55.     On July 25, the Governor and Cabinet considered Patronis' motion to terminate Rubin.  Rubin's attorney was granted five minutes to respond to the report.  Patronis grandstanded with a prepared speech accusing Rubin, without any conceivable factual basis, of "predatory behavior" and having "cross[ed] the limits of … human decency."  Cabinet member Nikki Fried walked out of the

---

[3] According to the report, "The OIG did not substantiate that the Commissioner submitted a person to an unwelcome sexual advance, a request for sexual favor, or physical conduct of a sexual nature to: impose a term or condition of employment; make an employment decision; unreasonably interfere with an individual's work performance; or make a decision affecting a person or entity regulated by or doing business with the agency."  This is the very definition of "sexual harassment" under both the law and DFS policy.

Chamber.   Based on the "executive summary," the remaining three FSC members (the Governor, Patronis and the Attorney General with Fried abstaining) voted to fire Rubin.

56.   Just three months earlier, Patronis siphoned $250,000 from state hurricane-relief funds to defend and settle a federal sex-discrimination lawsuit against him personally, along with a parallel agency grievance.   That litigation was filed by Christine Taul, another scrupulously ethical employee whom Patronis had fired.   Taul alleged, as Rubin does here, that Patronis ran his agency like a frat house, promoting his college buddies and firing his enemies, regardless of qualifications.   And, just as with Rubin, the enterprise retaliated by publicly smearing Taul, including Twitter posts falsely touting written complaints about her "management deficiency" and negative evaluations -- none of which existed in any agency personnel files, ever.

### The Enterprise Conceals the Evidence and Tries to Intimidate Rubin and His Lawyers from Prosecuting this Lawsuit

57.   In July 2019, Rubin officially filed for whistleblower protection for exposing the enterprise's corruption.   He then submitted lawful Sunshine Law requests to OFR and DFS seeking relevant text messages, emails and records of phone calls among the enterprise members.   In response, the enterprise leveraged its access to lawyers and the media, coordinating attacks on Rubin and his lawyers on multiple fronts.

58.   To begin with, DFS and OFR completely stonewalled Rubin's Sunshine Law requests.   Rubin complained to this Court, which promptly

ordered both agencies to "show cause" why they should not be ordered to produce the requested records.

59.     Two weeks after Rubin's evidence requests, one of the enterprise members hired a lawyer to threaten Rubin's counsel with personal retaliation for refusing to back down:



KLUGER KAPLAN

**Reply to:**
ALAN J. KLUGER, ESQ.
akluger@klugerkaplan.com
Tel: 305-379-9000

August 16, 2019

**VIA EMAIL**
Mr. Michael Tein, Esq.
Mr. Omar Malone, Esq.
Tein Malone, PLLC
3059 Grand Avenue
Coconut Grove, Florida 331333
tein@teinmalone.com
omar@teinmalone.com

Re:        **DEMAND TO CEASE AND DESIST**

Dear Mr. Tein:

The undersigned law firm represents Dr. Jeffrey P. Feingold ("**Dr. Feingold**").

We write to you in connection with the libelous statements that you have published in the June 21, 2019 complaint you filed on behalf of your client, Mr. Ronald Rubin ("**Mr. Rubin**"), in the case styled: *Ronald Rubin v. R. Paul Mitchell*, Case No. 2019-018942-CA-01 (43), in the Circuit Court for the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "**Complaint**"). The claims and representations in the Complaint pertaining to Dr. Feingold are false, misleading and obviously intended to unfairly cast Dr. Feingold in a false and negative light in the hopes it will benefit the meritless claims asserted in the Complaint.

In fact, you intentionally cast Dr. Feingold in a false light, accusing him, directly and through innuendos, of being a member of an "enterprise" carrying out criminal activity, including extortion. Your false accusations are serious and grave. Aside from causing Dr. Feingold to suffer severe damages as a proximate cause of your publication, these false statements constitute defamation *per se*.

You are hereby instructed to immediately cease and desist from continuing to defame Dr. Feingold, and from casting him in a false and derogatory light.  Demand is further made that you immediately strike those portions of the Complaint pertaining to Dr. Feingold, as they are not relevant to the any of the allegations against Mr. Mitchell, and that you run a retraction of the allegations made against Dr. Feingold retracting your false and defamatory statements by stating that you have no actual basis in fact to support any statements that you have made accusing, directly or indirectly, Dr. Feingold of being a member of a criminal enterprise and engaging in

---

Michael Tein, Esq.
Omar Malone, Esq.
August 16, 2019
Page 2

criminal activity. The retraction must be reviewed and approved by Dr. Feingold prior to its publication.

If this conduct continues, Dr. Feingold will seek all available remedies against you, including but not limited to exemplary and punitive damages upon a showing that the defamation was malicious, reckless and intentional. Additionally, once the Complaint is dismissed, we will bring an action against you for abuse of process for your deliberate use of court process to advance your ulterior motives.

I enclose separate letters demanding your insurance information pursuant to Florida Statute § 627.4137, and demand that you immediately take all steps necessary to protect and preserve all potential discovery, including electronically stored information ("**ESI**"). Your failure to protect and preserve the ESI can lead to serious consequences and sanctions against you.

Nothing set forth herein is intended, nor shall it be deemed, to modify, limit, release, reduce or waive any of Dr. Feingold's rights, remedies and/or privileges at law or in equity, all of which are specifically preserved.

**GOVERN YOURSELVES ACCORDINGLY!**

**KLUGER, KAPLAN, SILVERMAN, KATZEN & LEVINE, P.L.**

By: */s/ Alan J. Kluger*
       Alan J. Kluger, Esq.

cc:     Marko Cerenko, Esq.
        Dr. Jeffrey Feingold

60.     A week after that, Patronis and his lawyer Penrod publicly called for Rubin **and his lawyers** to be **criminally prosecuted**.   Penrod then publicly threatened to sanction Rubin's lawyers for complaining about DFS' refusal to produce the evidence he had requested.

61.     With Rubin and his lawyers still refusing to back down, Tony Grippa -- who has never been a client of Rubin's -- filed a Florida Bar complaint against Rubin.   The Florida Bar immediately recognized Mr. Grippa's stunt as an improper attempt to derail Rubin's lawsuit and dismissed the complaint:



62.     The day after Mr. Grippa filed his Bar complaint, Kimberly Grippa (who recently testified that she is "actually friends with" ex-husband Tony) filed an EEOC complaint against Rubin.  For the very first time, Ms. Grippa claimed that Rubin had sexually harassed, discriminated and retaliated against her during the March 2019 job interview.  Without citing any evidence, Ms. Grippa claimed that she "has since been denied job opportunities" but concealed the dispositive fact that in June 2019, **DFS had indeed offered her the job of Deputy General Counsel**, which **she turned down**:

---------- Forwarded message ---------
From: **Kim Grippa** <sunyfsu@gmail.com>
Date: Thu, Jun 27, 2019 at 11:02 AM
Subject:
To: <Ryan.West@myfloridacfo.com>

Dear Mr. West,

I write to inform you that I decline the offer of employment at the Office of the Insurance Consumer Advocate. I enjoyed interviewing with you for the Deputy General Counsel position and was excited about the opportunity to serve the citizens of Florida in this role. Unfortunately circumstances have changed, and I will not subject myself to further attacks by Mr. Ronald Rubin.

For maximum intimidation, Ms. Grippa's lawyers sent her EEOC complaint directly to Rubin's personal email address, on New Year's Day.

63.      To date, DFS and OFR have not produced a single communication between Mitchell and any Florida official about this matter.  Likewise, defendant Mitchell has yet even to respond to a single discovery request or produce a single record of his communications with the enterprise and its members.

## CAUSES OF ACTION

### COUNT 1
#### FLORIDA CIVIL REMEDIES  FOR CRIMINAL PRACTICES ACT
#### FLORIDA STATUTES § 772.103(3)

64.    Plaintiff realleges paragraphs 1 through 63 above.

65.    The following individuals, among others known and unknown, associated in fact and constituted an "enterprise" for the purpose of carrying out a pattern of criminal activity for their own benefit, aimed at Rubin, other individuals, and the citizens of the State of Florida:

      a.    Florida CFO Jimmy Patronis;

      b.    DFS Chief of Staff Ryan West;

      c.    DFS General Counsel Peter Penrod, Esq.;

      d.    OFR Chief of Staff Abigail Vail, Esq.;

      e.    OFR Director of Communications Jamie C. Mongiovi;

      f.    Florida lawyer Kimberly Grippa, Esq.;

      g.    Patronis patron/insurance magnate Jeffrey Feingold; and

      h.    Florida lobbyist R. Paul Mitchell.

66.    The "pattern of criminal activity" occurred between 2016 and the present and included incidents of criminal activity listed in Florida Statutes §§ 772.102(1)(a) & (b) as described above.

67.    Each of the members of the enterprise was employed by or was associated with the enterprise and did conduct or participate directly or indirectly in the enterprise through a pattern of criminal activity that by its nature projects into the future with a threat of repetition.

68.     Specifically, as described above, Mitchell and the members of the enterprise did commit, attempt to commit, conspire to commit and solicit another person to commit the following crimes enumerated in Florida Statutes § 772.102(1)(a):

> *§ 836.05     Extortion*
> *§ 838.015    Bribery*
> *§ 838.012    Corruption by threat against public servant/family*
> *§ 914.22     Obstruction of justice.*

69.     The threat of repetition is shown by the acts described above, including that the enterprise members have lavishly funded Patronis' political machine, which is still running; Mitchell's "lobbying" services traded promises for jobs filled by loyalists; and the enterprise used the same unlawful methods against multiple victims, including staffer Taul, a Deputy Commissioner two Commissioners.

70.     The enterprise's wrongful conduct caused economic and non-economic damages to Rubin and others.  Rubin's damages include without limitation, damage to his professional and personal reputation, loss of his job, and his inability to find suitable employment since.

71.     Rubin is entitled to recover treble damages and the fees and costs of prosecuting this lawsuit under Florida Statutes § 772.104(1)

WHEREFORE, Plaintiff Rubin seeks judgment against Defendant Mitchell for compensatory damages, treble damages, pre- and post-judgment interest, attorney's fees, costs, and such other and further relief as this Court deems just and appropriate.

26

## COUNT 2
### DEFAMATION *PER SE*

72.     Plaintiff realleges paragraphs 1 through 63 above.

73.     Shortly after Rubin released his May 28 statement refuting the public allegations, Mitchell emailed a false statement to a reporter for *Politico*, which *Politico* published on its website on May 29, asserting that Rubin's account was "largely fictional" and that, "in a state government career that spanned mere weeks, [Rubin] managed to rack up a series of sexual harassment complaints."

74.     Mitchell also emailed the same false statement to a reporter for the *Miami Herald*, which that newspaper published on May 31.

75.     On June 25, Mitchell emailed the identical statement to a reporter for the *Daily Business Review*, which statement that newspaper distributed in print and online.

76.     Mitchell's statements were widely published and not privileged in any manner.

77.     Mitchell made his statements with reckless disregard of their truth or falsity and/or with actual malice.

78.     In truth, as Mitchell then well knew, Rubin's account of Mitchell's conduct was not fictional; rather it was true and corroborated by emails, texts, and other witnesses, and Rubin had not been charged with "a series of sexual harassment complaints."

79.     Mitchell's statements were defamatory *per se* because they (a) tended to subject Rubin to hatred, distrust, ridicule, contempt or disgrace; (b)

tended to injure Rubin in his trade or profession; and (c) imputed to Rubin conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office.

80. Mitchell's statements forever falsely tainted and permanently damaged Rubin in the public perception.

WHEREFORE, Plaintiff Rubin seeks judgment against Defendant Mitchell for compensatory damages, pre- and post-judgment interest, costs, and such other and further relief as this Court deems just and appropriate.

### COUNT 3
#### DEFAMATION BY IMPLICATION

81. Plaintiff realleges paragraphs 72 through 80 above.

82. Mitchell defamed Rubin by knowingly, intentionally, willfully, recklessly, or negligently publishing statements about Rubin that he knew or should have known to be false or misleading.

83. Even if any of Mitchell's statements were true, they were published in such a way as to create a false impression of Rubin in the public perception.

84. Even if any of Mitchell's statements were true, they were published in such a way as to mislead the public in its perception of Rubin.

85. Mitchell's statements were widely published and not privileged in any manner.

86. Mitchell's statements forever falsely tainted and permanently damaged Rubin in the public perception.

WHEREFORE, Plaintiff Rubin seeks judgment against Defendant Mitchell for compensatory damages, pre- and post-judgment interest, costs, and such other and further relief as this Court deems just and appropriate.

## COUNT 4
### TORTIOUS INTERFERENCE

87.     Plaintiff realleges paragraphs 1 through 63 above.

88.     Mitchell had knowledge of Rubin's employment relationship with OFR.

89.     Mitchell improperly, intentionally, and unjustifiably interfered in Rubin's employment relationship by having an improper reason for interfering, as well as utilizing improper methods.

90.     Mitchell persisted in his actions despite the knowledge that his conduct would result in damage to Rubin, or at least was highly likely to damage Rubin.

91.     Mitchell's interference with Rubin's employment relationship, whether acting alone or in concert with others, induced the FSC to terminate Rubin's employment as OFR Commissioner.

92.     Mitchell's actions in inducing the termination of Rubin's employment relationship caused damage to Rubin.

WHEREFORE, Plaintiff Rubin seeks judgment against Defendant Mitchell for compensatory damages, pre- and post-judgment interest, costs, and such other and further relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff Rubin demands a trial by jury as a matter of right on all matters so triable.

**TEIN MALONE PLLC**
**COUNSEL FOR PLAINTIFF RUBIN**
3059 Grand Avenue
Coconut Grove, Florida 33133
(305) 442-1101

BY:   /s/_____
Michael R. Tein
Florida Bar No. 993522
T. Omar Malone
Florida Bar No. 697796
Gaye L. Huxoll
Florida Bar No. 149497
tein@teinmalone.com
service@teinmalone.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document was served on January 6, 2020 via the Court's e-filing portal, which will serve a copy on the following counsel of record:

> Thomas L. Hunker, Esq.
> thomas.hunker@csklegal.com
> Barry A. Postman, Esq.
> barry.postman@csklegal.com
> Cole, Scott & Kissane, P.A.
> 600 N. Pine Island Road
> Suite 500
> Plantation, Florida 33324
> *Counsel for Defendant*

/s/ Michael Tein